## RULE 26 REPORT OF VACHE CHAKMAKIAN, MD, AAFP, CCHP

Case of *LUCERO v. NGUYEN, et al.* CV 09-02151-GAF

### I. BACKGROUND AND QUALIFICATIONS

1. I am a Board Certified Family Physician (since 1990) with a background in Correctional Medicine and Emergency Medicine. My CV is attached. I have expertise in Correctional Medicine, Family Practice, and Emergency Medicine. I have reviewed and rendered an expert medical opinion in over 500 cases involving Correctional Medicine Standard of Care as it pertains to Emergency Medicine and General Internal or Family Medicine. I have reviewed cases at the County Jail, State Prison, and Federal Prison levels. As well as being Board Certified in Family Practice, I have the added Emergency Medicine qualifications of ACLS (Advanced Cardiac Life Support), ATLS (Advanced Trauma Life Support), and PALS (Pediatric Advanced Life Support). I also have the added Correctional Medicine Qualifications of being a Certified Correctional Health Professional, as certified by the National Commission on Correctional Healthcare, and a member of the Academy of Correctional Healthcare Professional (since 1998). For the past 3 ½ years, I have worked as a Primary Care Physician, and Chief Physician and Surgeon within the California Department of Corrections and Rehabilitation. During that time I have treated a few thousand of inmates / patients, prepared many of CDCR 7243 forms, and reviewed many of 1824 ADA Appeal forms.
2. I have not testified in any cases either in court or in deposition for the last 4 years.
3. I have been retained by The Law Offices of Kaye, McLane, & Bednarski, LLP regarding the case of *Lucero v. Nguyen, et al.* as it pertains to the medical care and management with regard to medical care at the California Institution for Men at Chino (CIM). My fees are $300/hour for expert case review, $3000 per day for depositions, and $5000 per day for court appearances.
4. This is a preliminary report in that the opinions are based only on information provided as of this date. I may review more facts and information as they arise.

### II. PREPARATION

5. I have reviewed the following:
    a. The Medical Records Presented at the Deposition of Dr. Hoan Nguyen;
    b. The Deposition Transcript of Dr. Nguyen;
    c. The Deposition of Dr. Farooq;

1

    d. The Deposition of Christine Collier;

I have also received a description from Plaintiff's counsel reflecting the Deposition testimony of Ms. Prescott, Ms. Jones, and Warden Poulos.

## III. CDCR GUIDELINES

5. The CDCR Health Services has statewide Policy and Procedure that is to be followed at all Institutions within the State of California. In addition, CIM has its own Local Operating Procedure. Chapter 8 of the CIM Local Operating Procedure entitled "Specialty Services" covers the provision of specialty services at CIM. These closely mirror the procedures I am familiar with at other institutions. With respect to Referrals for Services (RFS), the forms are to be filled out properly and completely by the CDCR Physician (PMD). Chapter 8 only provides specific guidelines for the timeliness of referrals made on an Emergent (immediate), Urgent (within 14 days), or Routine (within 90 days) basis. There are no other categories listed besides Emergent, Urgent, or Routine in the Policy in Chapter 8.

6. Chapter 8 also mandates that if an Urgent consultation cannot be scheduled within 14 days, the Chief Medical Officer (CMO) or Health Care Manager (HCM) shall be notified. Once the CMO/HCM is notified they are to take steps to ensure the consultation occurs within the appropriate time frame. A log is kept of all Urgent requests and when the requested consultations actually occur for the CMO/HCM to review quarterly. There is no Policy mandating such oversight for Routine requests.

## IV. SUMMARY OF RELEVANT MEDICAL EVENTS

7. On February 5, 2008, Mr. Lucero entered CIM on a parole violation. At this time he did not have the glaucoma medication he was previously prescribed and, according to Mr. Lucero's deposition, was taking regularly prior to his arrest.

8. On February 19, 2008, Mr. Lucero received his initial physical examination at CIM. (Bates 360). According to the records provided, Mr. Lucero stated during this examination "I have glaucoma due [sic] to aneurism in this eye @ age 15 'blind' L eye." The records indicate that Mr. Lucero was not receiving any medicine at that time. The records also state that his chart was not available.

9. On March 8, 2008, according to the CDCR 1824 Mr. Lucero filed on March 27, 2008, Mr. Lucero was seen by an unidentified triage nurse. He states that

the nurse was supposed to make him an appointment for the doctor who was in turn supposed to place on the list to see the optometrist because he needed new glasses.(Bates 671).
10. On March 21, 2008, Mr. Lucero injured his knee and was seen by Dr. Clinton. He was prescribed Motrin and Doxycycline. (Bates 416).
11. On March 27, 2008, Mr. Lucero filed a CDCR 1824 Reasonable Modification or Accommodation Request commonly known as an ADA Appeal Form. (Bates 671). In the Appeal, Mr. Lucero complains that he met with a triage nurse on March 8, 2008 and while the nurse gave him a visual impairment vest he had not yet seen the doctor or the optometrist as he requested to get prescription eye glasses.
12. On April 2, 2008, Mr. Lucero was again seen by Dr. Clinton regarding an x-ray of his knee. (Bates 417). Mr. Lucero also discussed his need to see an optometrist to get his glasses and Dr. Clinton made a referral for Optometry. (Bates 208.) On the CDCR 7243 referral, Dr. Clinton notes that Mr. Lucero is legally blind in his left eye and designates the Optometry referral as Routine.
13. On April 10, 2008, Mr. Lucero met with Dr. Nguyen to discuss his knee and the results of his x-rays. The records indicate that Mr. Lucero told Dr. Nguyen that he had glaucoma, that he was not on any eye drops, and that he last saw an ophthalmologist in 2007. (Bates 226; 415). Dr. Nguyen prepared a CDCR 7243 Referral for Mr. Lucero to see an Ophthalmologist but did not select Emergent, Urgent, or Routine but rather hand wrote in "ASAP" with no specific time frame referenced.
14. On April 10, 2008, Both Dr. Nguyen and CMO Farooq signed off on Mr. Lucero's CDC 1845 Disability Placement Program Verification and noted that he suffered from "Blind/Vision Impairment."
15. On April 17, 2008, Mr. Lucero met with Dr. Nguyen. (Bates 414; 672.) This was to follow up on Mr. Lucero's CDCR 1824 ADA appeal submitted on March 27, 2008. On the CDCR 1824 Form, Dr. Nguyen notes in the "discussion of findings" section that Mr. Lucero was seen on April 10, 2008, that he has glaucoma, is blind in the left eye, that an ophthalmology referral was submitted, and that his old prescription eye glass copy was given so he can send it to his family to make glasses.
16. On April 18, 2008, Mr. Lucero received a document entitled Inmate CDC1824 Appeal Notice of Suspend Status prepared by Medical Appeals Analyst C. Collier. (Bates 673). The Notice informs Mr. Lucero that the CDC1824 Appeal he filed was placed in suspend status pending evaluation with the Ophthalmology specialist at the CIM-MSF Consult Clinic in approximately 4-6 weeks.
17. May 6, 2008, Mr. Lucero is seen by an Optometrist.

3

18. On May 12, 2008, Mr. Lucero met with Dr. Nguyen. (Bates 21; 413). The records indicate that Mr. Lucero reported "headache" and that Dr. Nguyen prescribed Tylenol to be taken 3 times daily "as needed/headache/ko" and artificial tears to be taken in each eye 2 times daily. Dr. Nguyen also orders that Mr. Lucero's blood pressure be checked for a period of 14 days.
19. From May 12, 2008 to May 23, 2008, Mr. Lucero's blood pressure is checked by an LVN/RN as ordered by Dr. Nguyen during the May 12, 2008 consultation. (Bates 225).
20. On May 23, 2008, Mr. Lucero's eye ruptured and he was transported CODE III to the Riverside County Regional Medical Center for treatment. (Bates 411)
21. On May 24, 2008, Mr. Lucero returned to the CIM infirmary where the treating physician noted "Ruptured Globe and Spontaneous Eye Bleeding." (Bates 26).

## V. DISCUSSION OF GLAUCOMA AND GENERAL MEDICINE

22. Glaucoma is an eye disease that can cause Optic Nerve (the nerve that transmits vision) damage. There are many causes, but it is usually due to increase in eye pressure, specifically, intraocular pressure (IOP). It is important to treat because Glaucoma can lead to changes in vision including blindness, severe pain, and possible damage to the structure of the eye itself.
23. The Standard of Medical Care of an Internist, Family Physician, and General Physician (Primary Medical Doctor or PMD) as it relates to Glaucoma would be to refer to an Ophthalmologist. Glaucoma should not be managed by any other physician in respect to Diagnosing, Treating, or Changing Medications. This is considered basic to prevent changes in eye sight as well as manage pain and possible injury due to IOP. The PMD would also have a duty to assess the existing course of glaucoma medication.
24. Any change in a patient's condition or symptoms, as it relates to Glaucoma, should be referred immediately. These include pain (such as eye pain and headaches), changes in Blood Pressure, changes in vision, any abnormal sensation in the eye, etc. Of special concern would be the importance of referring a patient immediately to an Ophthalmologist if the patient states they have Glaucoma, but are not taking medications.

## VI. OPINIONS

### A. Dr. Nguyen

25. When Mr. Lucero presented himself to Dr. Nguyen on April 10, 2008 as having: glaucoma, no eye drops, and no Ophthalmological consultation since

2007, the medical standard dictates that he should be evaluated immediately by an Ophthalmologist.

26. The first component of the necessary evaluation, however, would be simple interview techniques and observations that there is no evidence Dr. Nguyen performed on April 10, 2008. Without the PMD asking the necessary questions it is essentially up to the patient to self-report and even diagnosis which is below the standard of care. For example, Dr. Nguyen apparently did not ask *why* Mr. Lucero was not on his medication to determine if he was *supposed* to be on a certain necessary medication. There is also no indication that Dr. Nguyen inquired if Mr. Lucero's glaucoma was "cured," static, or simply undiagnosed since 2007. Additionally, while a PMD is inherently not qualified to diagnose and treat glaucoma, there are several important observations they are qualified to make to inform the appropriate timeline for a referral to an Ophthalmologist. Dr. Nguyen should have performed a basic eye examination on Mr. Lucero beyond simply noting that he was blind in his left eye. Specifically he should have noted if his eye was real or prosthetic, extraocular motions, eye tracking, if the pupils were equal round reactive to light or not, whether the sclera was white, the presence of red reflex, the presence of fundus or any landmarks, and the presence of any optic disc vessels. In addition, the PMD should gently palpate the globe for tenderness or a difference of tension. If Dr. Nguyen would have performed the necessary interview and evaluation he may have appropriately expedited his referral to an Ophthalmologist.

27. As above it is unclear what inquiry if any Dr. Nguyen made during the April 10, 2008 consultation with Mr. Lucero regarding what "eye drops" he was previously taking and the reason he did not currently have them. Even if Mr. Lucero himself would have been unaware of exactly what medication he was taking, Dr. Nguyen had a responsibility to contact the pharmacy to see if there was any record of past prescriptions for Mr. Lucero, either in hard copy or on computer. There is no indication this was done.

28. The Unit Health Record (UHR) is the most comprehensive collection of patients' medical records generated while they are in CDCR custody. If an inmate transfers from another institution within the CDCR, his UHR is supposed to follow him. If, however, he returns "from the street" on a parole violation it supposed to take approximately 2 weeks for an institution like CIM to receive it. The UHR record is essential to providing appropriate medical care. This is especially true when treating a patient like Mr. Lucero with a complex condition of the eye like glaucoma. Despite the fact that it was more than 4 weeks after Mr. Lucero entered CIM, during the April 10, 2008 consultation, Mr. Lucero's UHR was not available to Dr. Nguyen. A PMD like Dr. Nguyen, however, has the authority to call the Medical Records Office at

CIM and have the UHR ordered on an expedited or even over-night basis. He also had the ability to contact the Chief Medical Officer regarding any delays. There is not any indication that Dr. Nguyen did that here. Dr. Nguyen should have immediately pursued the Medical records. That Dr. Nguyen did not even make a simple phone call to Medical Records to see if the chart was there is below the standard of care. Dr. Nguyen's own deposition testimony highlights how important the UHR is to providing effective medical treatment. Dr. Nguyen testified that if he had access to Mr. Lucero's prior Ophthalmological charts from RCRMC (which are contained in the UHR) that indicated Mr. Lucero had "scleral thinning" he would referred him to an Ophthalmologist on at least an Urgent rather than "ASAP" basis.

29. Dr. Nguyen had the ability to contact numerous medical resources prior to deciding the timeline of Mr. Lucero's referral on April 10, 2008. He could have called a CIM contract hospital, including RCRMC, and spoken with a qualified Ophthalmologist; he could have called the contracted Ophthalmologist who visited CIM on a weekly basis; he could have consulted with the CMO Dr. Farooq or the Chief Physician, or he could have consulted with another PMD for a second opinion. His failure to utilize any of these available resources is below the standard of care.

30. Dr. Nguyen's failure to refer Mr. Lucero to an Ophthalmologist immediately on April 10, 2008 was below the standard of care. Dr. Nguyen had no expertise in glaucoma, and based on his deposition testimony, appears to have no familiarity with the eye in general. Without the UHR, he had no information regarding Mr. Lucero's specific past diagnosis or necessity of medication and therefore no basis to form an opinion about the appropriate timeline for Mr. Lucero's treatment going forward. All Dr. Nguyen knew on April 10, 2008 was that Mr. Lucero had glaucoma, was not on his medication, and hadn't seen an Ophthalmologist since 2007. Those facts alone should have triggered immediate evaluation by an Ophthalmologist. On April 10, 2008, Dr. Nguyen had the authority and ability to refer Mr. Lucero on an emergent basis to the necessary Ophthalmological specialty. CIM had daily vans that transported patients to the nearby RCRMC which, according to documents, had a contract eye clinic available every Tuesday through Friday (April 10, 2008 fell on a Thursday). This schedule would likely be well known at CIM due to the fact that RCRMC is a contracting hospital, and would be easily obtainable at CIM.

31. The 7243 RFS prepared by Dr. Nguyen on April 10, 2008, referring Mr. Lucero to an Ophthalmologist on an "ASAP" basis was below the standard of care. Besides the fact that the medically appropriate referral in this case was "emergent," procedurally, hand writing in the word "ASAP" on the form was below the standard of care in and of itself. It is basic medical procedure to fill

out the 7243 form properly which includes only the options provided – emergent, urgent, and routine. The term "ASAP" appears nowhere in Chapter 8 of the CIM Local Operating Procedure and has no meaning within the CDCR policy. Most importantly, ASAP has no timeframe for treatment associated or mandated by policy dictating when exactly Mr. Lucero was supposed to be seen by an Ophthalmologist. As far as the policy of the CDCR is concerned, an "ASAP" designation would at best be treated as synonymous with Routine which means 90 days.

32. By improperly designating Mr. Lucero's referral as "ASAP," Dr. Nguyen also effectively shielded the designation from the appropriate oversight that would have occurred if he marked Urgent. As above, if Dr. Nguyen would have at least designated the referral as Urgent, there are certain guarantees that Mr. Lucero would have in fact been seen by an Ophthalmologist within 14 days. If there was a problem with scheduling the consultation within 14 days, the CIM scheduler would have contacted CMO Farooq, who would then have intervened on Mr. Lucero's behalf to ensure he received a timely appointment. Due to the improper "ASAP" designation, however, there was no such oversight of Mr. Lucero's pending Ophthalmology referral.

33. Dr. Nguyen had two other encounters with Mr. Lucero in which he should have referred him on an emergent basis to an Ophthalmologist immediately during visits with him on April 17, 2008 and May 12, 2008. He failed to do so. At a minimum, Dr. Nguyen was obligated to call the specialty services clinic to periodically follow up on the referral and attempt to determine when Mr. Lucero would be seen by an Ophthalmologist. Failure to do so was below the standard of care. The documents and deposition testimony show that a Calendar reflecting on site Ophthalmology consultations was available to Dr. Nguyen during this time period. Most notably, according to the Calendar there was a scheduled on-site Ophthalmology visit at CIM on May 12, 2008, the very day Dr. Nguyen met with Mr. Lucero. Given that it had been more than a month since the original "ASAP" referral was made, and Mr. Lucero had still not been seen, it was incumbent up Dr. Nguyen to call the on-site clinic and see if Mr. Lucero could be seen by an Ophthalmologist that day. He did not. Also, as stated above, he failed to consult with any of the on-site or off-site Ophthalmologists who were available to him by telephone. This lack of action on Dr. Nguyen's part is below the standard of care. This lack of action failed to get Mr. Lucero a timely referral.

34. Dr. Nguyen's actions on May 12, 2008 were perhaps his most egregious deviation from the standard of care. The consultation occurred a month after Dr. Nguyen's first visit with Mr. Lucero and more than 3 months after Mr. Lucero entered CIM. Dr. Nguyen still did not have the benefit of Mr. Lucero's

7

UHR and again took no action to contact medical records to request expedited or overnight delivery. He knew Mr. Lucero had glaucoma, had not seen an Ophthalmologist or been properly managed since 2007, had been without medication for at least 3 months, and was now complaining of a headache. The standard of care demanded Dr. Nguyen immediately refer Mr. Lucero to an Ophthalmologist at that point, as a headache is one of the clearest symptoms of a problem with Glaucoma.

35. The actions he did take were also below the standard of care. He prescribed Mr. Lucero Artificial Tears. Implicitly, there must have some complaint by Mr. Lucero about his eyes. With a patient with chronic glaucoma, it was incumbent upon Dr. Nguyen to once again, have Mr. Lucero evaluated by an ophthalmologist immediately. Dr. Nguyen, through his own admission, did not have any expertise in ophthalmology, and should have inquired further. Also, Dr. Nguyen prescribed Tylenol for "headache," but doesn't describe the headache(s) severity, location or duration. Finally, Dr. Nguyen orders blood pressure checks but fails to indicate why they are necessary and what the parameters of these tests should be, i.e., does Dr. Nguyen get updated daily, and if not, what numbers are supposed to trigger what response from the RN administering them?

36. The fact that Mr. Lucero saw an Optometrist on May 6, 2008, prior to his final consultation with Dr. Nguyen on May 12, 2008 does not change the necessity of an immediate referral to Ophthalmology. Optometrists and Ophthalmologists perform different functions and in fact seeing an Optometrist is generally a mere prerequisite to a scheduled Ophthalmology appointment.

37. I have been informed of Plaintiff's ophthalmological expert's, Dr. Tannenbaum's, opinion about the causation of the rupture of Mr. Lucero's eye ball. I agree that if Dr. Nguyen had followed the standard of care and had Mr. Lucero seen by an ophthalmologist on either April 10th, April 17th, or May 12th, 2008, the rupture of Mr. Lucero's eyeball would have been avoided.

B. CMO Dr. Farooq

38. Dr. Farooq was the Chief Medical Officer (CMO) at CIM starting in April of 2007 to the present. Part of his job description as CMO is to oversee overall quality of care, set polices and procedures, conduct peer review, and plan, organize, and direct the medical and clinical services for the care and treatment of inmates at CIM. In this case, Dr. Farooq acted below the standard of care for a supervising physician and CMO in several areas.

39. As CMO, Dr. Farooq is responsible for ensuring there was a system in place which provided the doctors at CIM adequate access to patients' medical

8

records, including their UHR. CMO Farooq was aware that if physicians did not have adequate access to medical records, it could potentially lead to mistakes made in treatment. He was also aware that in some cases relying on inmates to self report without access to their chart is insufficient, especially when the patient presents a complex medical problem. Despite this, CMO Farooq did not ensure there was adequate access to patient's medical records at CIM in April and May of 2008. Reports from Dr. Ronald Shanksy and Dr. Craig Haney detail systematic problems in medical record keeping throughout the CDCR, and at CIM in particular, on or about the time of Mr. Lucero's eye rupture. Additionally, Dr. Nguyen testified that based on his knowledge of the state of medical records at CIM during the relevant time period, it was "expected" that he would not have access to Mr. Lucero's UHR during his April 10, 2008 consultation (approximately 2 months after Mr. Lucero entered CIM) and it was similarly "expected" that he would not access to Mr. Lucero's UHR during his May 12, 2008 consultation (approximately 3 months after Mr. Lucero entered CIM). In fact, Dr. Nguyen testified that he complained regarding the availability of medical records and CMO Farooq testified that he recalled getting complaints from doctors regarding medical records. CMO Farooq himself stated that medical records for some inmates may have been fragmented or incomplete, that in April 2008 it is possible there were up to 60 inches of "loose filing" in the medical records room (some of which may have been up to a month old), and that it was possible there were still two boxes of loose filing even after efforts were made to hire additional medical records staff and authorize additional overtime. Whether the state of medical records was as poor as observed in the expert reports or available "85-90%" of the time as testified by CMO Farooq in his deposition, these deficiencies were CMO Farooq's responsibility to correct immediately. His failure to do so was below the standard of care. Dr. Nguyen testified that if he would have had access to Mr. Lucero's UHR containing prior Ophthalmology records from RCRMC on April 10, 2008, he would have at least referred him to Ophthalmology on an Urgent rather than "ASAP" basis. If that were the case, per policy Mr. Lucero would have been seen by an Ophthalmologist within 14 days, or approximately April 24, 2008, well before the rupture of his eye in this case.

40. CMO Farooq was also responsible for training and supervising physicians like Dr. Nguyen and was below the standard of care in this regard. Even if one assumes that CMO Farooq is correct that in only 10-15% of consultations the physician would not have access to the UHR, the PMC needed special training and supervision on how to address the lack of medical records. Dr. Farooq testified that there is no special training at CIM for physicians regarding how to appropriately treat a patient in the absence of medical records. CMO also

9

testified that there is no CIM policy regarding how a physician is supposed to proceed in the absence of medical records. This failure to train and supervise is below the standard of care.

41. Similarly, CMO Farooq testified CIM provides no specific training or policy regarding how a doctor is suppose to treat a patient who presents a condition beyond their medical expertise. This failure to train and supervise is below the standard of care.

42. Additionally, CMO Farooq testified there was no specific training or policy informing physicians when and if they should make telephone contact with a specialist outside of their expertise to inquire regarding the appropriate time frame in which to schedule a specialty service consultation. This failure to train and supervise is below the standard of care.

43. Additionally, CMO Farooq testified that he is unaware how doctors are trained at CIM regarding the specific criteria they should utilize to determine if a specialty service should be requested on an Emergent, Urgent, or Routine basis. This failure to train and supervise is below the standard of care.

44. CMO Farooq was also below the standard of care by ratifying and adopting an improper practice at CIM where doctors would complete 7243 RFS Forms without selecting the required Emergent, Urgent, or Routine options. CMO Farooq testified that while those 3 options are the "broad policy guidelines" at CIM it is also acceptable to hand write in ASAP as Dr. Nguyen did in this case. Dr. Nguyen testified that this case was not the first time he had used the designation ASAP on a 7243 Form and had never been previously disciplined or otherwise corrected regarding this practice. As above, the practice of writing ASAP on the 7243 RFS Form is improper under CDCR Policy and below the standard of care. CMO Farooq's failure to train and supervise regarding this practice was below the standard of care.

45. CMO Farooq is also responsible for a systemic deficiency in the 1824 ADA appeals process at CIM. In this case, Mr. Lucero appealed the denial of timely access to both optometry and ophthalmology services. This was Mr. Lucero's last available administrative resort. This appeal then went to Medical Appeals Analyst C. Collier, who is not a doctor or nurse and has no apparent medical training. CMO Farooq testified that simply based on the fact that a specialty service request was *pending* at the time of the appeal, Ms. Collier appropriately suspended the appeal for an estimated 4-6 weeks. He further testified that in the case of a suspension, he likely never reviewed the appeal at all. Thus, this system effectively provided no qualified medical oversight whatsoever for Mr. Lucero's condition by way of appeal. CMO Farooq's failure to implement an appropriate 1824 ADA Appeals process at CIM was below the standard of care.

46. Finally, CMO Farooq testified that Mr. Lucero's eye rupture triggered an internal investigation as it was an unusual or "unexpected" result. As part of this investigation, CMO Farooq reviewed Mr. Lucero's UHR and interviewed Dr. Nguyen and C. Collier among others. Despite the numerous actions by both Dr. Nguyen and C.Collier which were below the standard of care which are set forth in this report, Dr. Farooq found absolutely nothing wrong with the performance of their medical duties, and there was no reprimand, discipline, or training related to the handling of Mr. Lucero's care of any kind. This lack of discipline, training and supervision in the face of a host of actions which were clearly below the standard of care. In this case, CMO Farooq abandoned his responsibilities as Chief Medical Officer at CIM and ratified medical practices which were far below the standard of care.

## C. Appeals Analyst Collier

47. C. Collier performed her duties as Medical Appeals Analyst below the standard of care in this case. When she received Mr. Lucero's 1824 ADA Appeal Form it was incumbent on her to inquire into the specific time frame he was supposed to receive the requested Ophthalmology referral that was included as part of that appeal on April 17, 2008 by Dr. Nguyen. Even a superficial review of the 7243 RFS form should have revealed to her that the request was made on something other than a Routine basis. If in fact she called the specialty services clinic and they informed her as she testified that the next Ophthalmology appointment would not be available for 4-6 weeks as she indicated on the Notice of Suspension, she had a duty to reconcile that time frame with Dr. Nguyen's nebulous "ASAP" designation. This is especially true give that the nature of the appeal was regarding the denial of the timely provision of specialty services. In any event, it was below the standard to unilaterally "suspend" the appeal without further information or input from Dr. Nguyen or the CMO as to the appropriate disposition of this appeal.

48. In addition Ms. Collier testified that simply based on the fact that a specialty service request was *pending* at the time of the appeal, she appropriately suspended the appeal for an estimated 4-6 weeks. There is *no* policy or procedure within the CDCR that supports that position. In fact, it is contrary to reasonable medical care because, as was the case here, the referral for specialty services was diverted indefinitely, and since the appeal was suspended, Mr. Lucero had no remedy. An appeal should have brought the failure of Mr. Lucero to see an ophthalmologist in a timely fashion to the attention of the CMO and PMC, and thereby triggering an appointment.

11

### D. Former Warden Poulous

49. Former Warden Polous as the Warden of CIM in 2008, had ultimate responsibility for the safety and security of the inmates at CIM. CMO Farooq testified that Former Warden Polous was personally present at the Quality Management Committee Meetings in 2007 where the issue of loose filing in the medical records office was discussed. In addition, I have been informed that Warden Poulos testified that he placed additional security staff into the medical records department based on this loose filing. Also, given the fact that the federal court had imposed a receivership, specifically referring to the problem with medical records, Warden Polous was aware of the medical records problem at CIM. It was his responsibility to remedy this problem, and his failure to do so – as demonstrated in Mr. Lucero's case – was below the standard of care.

DATED: 3/1/11                                              _____
                                                            Vache Chakmakian, MD